UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| UNITED STATES, | ) | |
|---|---|---|
| | ) | |
| v. | ) | 1:15-cr-00040-JAW-3 |
| | ) | |
| JERMAINE MITCHELL, | ) | |
| | ) | |
| Defendant | ) | |

**RECOMMENDED DECISION ON MOTION FOR NEW TRIAL**

On June 27, 2016, at the conclusion of a five-day trial, a jury convicted Defendant Jermaine Mitchell of conspiracy to distribute and possess with intent to distribute 280 grams or more of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. The jury found both that Defendant was part of a conspiracy to distribute cocaine base and that Defendant's conduct involved 280 grams or more of cocaine base. (Jury Verdict, ECF No. 520.)

The matter is before the Court on Defendant's Motion for New Trial and for Indicative Ruling.[1] (ECF No. 719.) Through his motion, Defendant contends that new evidence impugns the veracity of Rodrigo Ramirez, a witness who testified about Defendant's involvement in the conspiracy.

---

[1] On February 16, 2017, Defendant appealed from the Court's judgment. (Notice of Appeal, ECF No. 693.) The appeal remains pending before the First Circuit Court of Appeals; Defendant/Appellant Mitchell's reply brief is due March 5, 2018. (First Circuit docket # 17-1183.) While the Court could only issue an indicative ruling if the Court concluded Defendant's motion for new trial had merit, the Court can deny the motion despite the pending appeal. F.R.A.P. 12.1; Fed. R. Civ. P. 33, 37(a).

**BACKGROUND**

On February 12, 2015, the grand jury returned a three-count indictment that charged eleven defendants with one or more of the following offenses: conspiracy to distribute cocaine base, use or maintenance of a drug involved premises, and conspiracy to violate federal firearms laws. (ECF No. 3-1.) Defendant was charged with conspiracy to distribute cocaine base. The conspiracy was alleged to exist among Defendant Mitchell, co-Defendants Jeffrey Benton, Christian Turner, Willie Garvin, Torrence Benton, Jeremy Ingersoll-Meserve, Jacqueline Madore, David Chaisson, Akeen Ocean, Burke Lamar, and Wendell White, and certain others, including Rodrigo Ramirez.[2]

The evidence at trial demonstrated that Defendant and others were involved in a drug distribution operation for approximately three years (2010 – 2013), which activity included the distribution in and around the Bangor area of cocaine base that was obtained in New Haven, Connecticut. Rodrigo Ramirez testified on behalf of the Government as a cooperating witness. Mr. Ramirez has a notable criminal history. In addition to his drug distribution activity, Mr. Ramirez testified that he participated in a New Haven robbery in 2011 that resulted in a homicide.[3] (ECF No. 636 at 132 – 33.)

---

[2] During the trial, as reflected by the trial transcripts referenced herein, the individuals involved in the drug activity were often referred to by a known nickname. Defendant is referred to as Blood, Melo, or MB, Mr. Benton as Fresh, Tallman, or JT, Mr. Turner as P, Pistols, CT, Mr. Ocean as A or Alex, and Mr. Ramirez as Rico.

[3] According to his trial testimony, Mr. Ramirez drove the car, but did not enter the premises at which the robbery occurred. The Court instructed the jury that the Government did not contend Defendant had any connection to the homicide, and that the jury must not draw any adverse inference against Defendant that he had any involvement in the homicide. (ECF No. 636 at 139 – 40.)

*1.     The New Evidence*

In support of his motion, Defendant cites statements Mr. Ramirez made to law enforcement, after Defendant's conviction, in connection with a homicide/heroin distribution investigation conducted by law enforcement in Connecticut. Defendant contends that a new trial is warranted because Mr. Ramirez advised law enforcement that he had been untruthful in some of the statements he made regarding crimes committed in Connecticut, which disclosure generates further questions about Mr. Ramirez's credibility.[4]

*2.     Trial Evidence of Defendant's Guilt*

At Defendant's trial, Mr. Ramirez testified that he distributed drugs in the Bangor area for approximately three years, and that others who participated in the same drug distribution group included Defendant, Mr. Benton, Mr. Turner, and Mr. Ocean. (ECF No. 636 at 129 – 30.)  According to his testimony, Mr. Ramirez came to Maine in 2011 after the robbery-turned-homicide incident in Connecticut, when Mr. Benton recommended to him that he move to Maine to avoid trouble in New Haven and so he could assist with distributing cocaine base in Maine. (*Id.* at 142 – 46.) Mr. Benton introduced Mr. Ramirez to Defendant in New Haven, and Mr. Ramirez traveled to Maine with Defendant a few days later. (*Id.* at 147.) On their initial arrival in Maine, they went to "Amy's house in

---

[4] In response to Defendant's motion, the Government filed under seal a copy of a report written in February 2017, which report contains the new evidence upon which Defendant bases his motion. Defendant is evidently aware of the subject of the report because the Government informed his counsel of the report.

Old Town."[5] (*Id.* at 149.) Thereafter, Defendant arranged for Mr. Ramirez to stay, initially, "at this lady Fern's house," but soon relocated Mr. Ramirez to "a lady named Christie's house" in Bangor.[6] (*Id.* at 148, 159.)

Mr. Ramirez testified that Defendant was directly involved in the Maine-based drug distribution conspiracy in that Defendant resupplied the cocaine base when inventory was low, set the price, determined how dealers would be compensated for their efforts, and collected the revenue that Mr. Ramirez gathered for him. (*Id.* at 150 – 163.) Mr. Ramirez, Defendant and others periodically arranged for money to be sent back to New Haven to Mr. Benton. (*Id.* at 170 – 71.) According to Mr. Ramirez, he severed his association with Defendant in 2013, because he was no longer getting along with Defendant and another conspirator. (*Id.* at 180.)

In addition to describing the conspiracy, Mr. Ramirez provided testimony relevant to the drug quantity. Mr. Ramirez testified that he was located at Christie's apartment for a period of months and that Defendant supplied him with 12 packages containing half-gram or one-gram "rocks" two or three times per day, on average. (*Id.* at 165, 168.) Mr. Ramirez also testified that revenue from the sales was nearly $20,000 each week, with one-gram packages selling for between $75 and $100, and half-gram packages selling for $50. (*Id.* at 169 – 70.) On cross-examination, counsel explored Mr. Ramirez's criminal history,

---

[5] "Amy's house" was a residence shared by Defendant Mitchell and Amy Hakola, located on Charles Street in Orono. During the trial, witnesses referred to the residence as Amy's house and the Charles Street residence. Some witnesses referred to the home as being in Old Town. The boundary between Orono and Old Town is not far from the residence.

[6] Eventually, Mr. Ramirez would relocate to both "Jeremy's house" and "Wendell's house," where his drug distribution activity continued. (ECF No. 636 at 173.)

4

prior instances in which he was untruthful to law enforcement, and the fact that he was testifying with the hope of lenient treatment by the Government. (*Id.* at 192, 197 – 198, 211 – 219; ECF No. 637, at 244 – 79.)

Mr. Ramirez was not the only government witness to connect Defendant to Mr. Benton, or Defendant to dealers who aided the conspiracy's drug distribution efforts. Mr. Ramirez was also not the only source regarding the drug quantity. Fern Dowling testified that Defendant asked her to sell crack for him and that she did so for an unspecified time prior to being introduced to Mr. Ramirez. (*Id.* at 335, 337 – 40.) Ms. Dowling stated she travelled to Connecticut with Defendant and transported two ounces (approximately 56 grams) of crack cocaine to Maine from Connecticut. (*Id.* at 341 – 42.) Ms. Dowling sold crack cocaine to approximately 20 people in the Old Town and Bangor area. (*Id.* at 345.) She estimated that she sold for Defendant for "a couple years" on a daily basis, with a "good day" consisting of sales of "like between 3 – like 5 and 6 grams a day." (*Id.* at 351.) Ms. Dowling further testified that she also obtained crack cocaine from Mr. Ramirez, while Defendant operated out of the residence of another conspirator, i.e., when Mr. Ramirez continued to distribute crack on behalf of Defendant.[7] (*Id.* at 350.)

---

[7] Ms. Dowling also sold crack cocaine that she obtained from Mr. Turner. (ECF No. 637 at 347.) She testified that she thought Mr. Ramirez and Mr. Turner were not working together and that Defendant "flew by himself." (*Id.* at 347, 374 – 75.) However, multiple other witnesses connected Mr. Ramirez, Mr. Turner, and Defendant as members of the same operation. Brynn McLeod testified that she saw both Mr. Ramirez and Mr. Turner at the Charles Street home in Orono, i.e., the residence Defendant shared with Ms. Hakola; that it was her impression that Mr. Ramirez and Mr. Turner worked together because orders placed with one would sometimes be filled by the other; and that both men sold on occasion out of the Charles Street residence and a residence on Sanford Street in Bangor. (ECF No. 611 at 605, 608 – 609, 617.) Similarly, Jeremy Hunter testified that orders placed over the phone with Mr. Ramirez would sometimes be filled by Mr. Turner, that the two were together, and that both men showed up to deliver one or more orders Mr. Hunter placed over the phone. (*Id.* at 632, 638.) Jeremy Ingersoll-Meserve provided similar testimony. (ECF No. 612 at 726.)

5

Christie Thetonia also testified that she distributed crack cocaine for Defendant. According to Ms. Thetonia, she met Defendant after going to Ms. Dowling and to a person named Kizzy to purchase crack cocaine. Ms. Thetonia reported that Defendant supplied the crack cocaine to Ms. Dowling and Kizzy, on more than one occasion when she was present. (*Id.* at 432 – 33.) Eventually, Ms. Thetonia obtained crack cocaine directly from Defendant. (*Id.* at 433, 435.) For a period of two or three months, she obtained 2 or 3 grams on many days. (*Id.* at 436.) She estimated that during this period she obtained 100 grams from Defendant. (*Id.*) Subsequently, Defendant arrived at Ms. Thetonia's residence with Mr. Ramirez. Mr. Ramirez stayed at Ms. Thetonia's residence and held crack cocaine that she helped to distribute from her residence, so that Defendant would not need to make frequent trips to her home. (*Id.*) Mr. Ramirez remained at Ms. Thetonia's residence for five or six months. (*Id.* at 441.) Ms. Thetonia estimated that Mr. Ramirez distributed about 100 grams of cocaine base through her, another 100 grams through her boyfriend, Mr. Ocean,[8] and that the cocaine base was delivered to the residence by Defendant, and on occasion by Mr. Benton. (*Id.* at 444, 480.)

Jeremy Hunter reported that a couple of times each week, he would also purchase crack cocaine directly from Defendant. (*Id.* at 642.) He also described occasions when he was with Mr. Benton, Mr. Ramirez and Defendant. (*Id.* at 647.) On at least one occasion he purchased crack cocaine from Mr. Benton with Defendant present. (*Id.* at 648.)

---

[8] Ms. Thetonia also testified that it was possible Mr. Ocean received a lesser quantity of cocaine base than she did. (ECF No. 611 at 505, 511 – 12.)

Jeremy Ingersoll-Meserve was present in Ms. Thetonia's residence on one or more occasions with both Mr. Ramirez and Defendant. (ECF No. 612 at 718, 721.) Approximately a year after first dealing with Mr. Ramirez at Ms. Thetonia's residence, Mr. Ingersoll-Meserve began purchasing crack cocaine directly from Defendant. (*Id.* at 721.) He often purchased crack cocaine on behalf of others, and would acquire it from Mr. Ramirez, Mr. Turner, or Defendant. (*Id.* at 720, 723.) Mr. Ingersoll-Meserve offered a conservative estimate that he purchased between 200 and 250 grams from Mr. Ramirez, between 150 and 200 grams from Mr. Turner, and between 50 and 70 grams from Defendant. (*Id.* at 736.)

Burke Lamar also testified regarding the connections he observed between and among Defendant, Mr. Ramirez, Mr. Turner, and various street-level dealers, and between Connecticut and Maine. (ECF No. 613 at 962 – 68.) In addition, Amy Hakola testified to associations among several conspirators, including Defendant, Mr. Ramirez, Mr. Turner, and Ms. Dowling, which associations she observed at the Charles Street residence where she lived with Defendant throughout the relevant period. (ECF No. 636 at 48 – 56, 61, 64, 73 – 77.)

**STANDARD FOR GRANTING NEW TRIAL**

A criminal defendant may move for a new trial based on newly discovered evidence. Fed. R. Crim. P. 33(b). To obtain a new trial, a defendant must show (1) that the evidence in question was unknown or unavailable at the time of trial; (2) that the failure to discover the evidence sooner was not due to the defendant's own lack of diligence; (3) that the evidence is material and not merely cumulative or impeaching; and (4) that introduction of

7

the evidence at a new trial probably would result in an acquittal. *United States v. Maldonado-Rivera*, 489 F.3d 60, 66 (1st Cir. 2007). However, if the evidence is merely impeachment, but the movant demonstrates that the government suppressed the evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), the fact the evidence is merely impeachment does not preclude a new trial, and the third and fourth elements of the test are replaced with a more lenient standard requiring only that the movant persuade the court that there is a reasonable probability that timely disclosure of the evidence would have yielded a different result at trial. *United States v. Connolly*, 504 F.3d 206, 212 – 13 (1st Cir. 2007). The lower standard is met if the evidence undermines the court's confidence in the jury's verdict. *United States v. Peake*, 874 F.3d 65, 69–70 (1st Cir. 2017).

Under either approach, a court is free to weigh the evidence and evaluate the credibility of the witnesses at trial and the credibility of any witness whose testimony the movant introduces as new material evidence. *United States v. Wright*, 625 F.2d 1017, 1019 (1st Cir. 1980). A court is not required to conduct an evidentiary hearing to determine the motion. Evidentiary hearings are the exception rather than the rule, and the court is free to resolve a Rule 33 motion based on "a practical, commonsense evaluation" of the record. *Connolly*, 504 F.3d at 219.

## DISCUSSION

Defendant contends that because Mr. Ramirez provided more detailed information regarding Defendant's involvement in the supply of drugs than the information provided by other witnesses, Mr. Ramirez's trial testimony was essential to the conviction, and, therefore, if Defendant had the benefit of Mr. Ramirez's statements to law enforcement in

8

Connecticut, Defendant's impeachment of Mr. Ramirez would have, or potentially could have, resulted in an acquittal. (Motion at 4 – 6.) The Government concedes that Defendant has satisfied the first two elements of the Rule 33 standard (i.e., that the evidence was unknown or unavailable at the time of the trial, and that Defendant was not dilatory in discovering the evidence), but argues that the evidence goes solely to impeachment, does not meet the materiality element, and does not undermine confidence in the conviction. (Gov't Objection, ECF No. 721, at 1, 12 – 14.)

A review of the record reveals that Defendant's argument is unpersuasive. First, Mr. Ramirez's statements to Connecticut law enforcement in 2017 do not constitute exculpatory evidence. Rather, the statements attributed to him would tend to impeach his credibility. Second, because Mr. Ramirez did not make the statements until after Defendant's trial, there is no *Brady* violation. Third, the statement concerns a collateral matter - a homicide investigation in Connecticut. The fact that Mr. Ramirez might have been untruthful in that homicide investigation does not bear directly on the accuracy of the testimony he provided regarding the Maine-based drug distribution conspiracy. Indeed, Mr. Ramirez explicitly stated that Defendant was not involved in the Connecticut homicide. Fourth, Mr. Ramirez's post-trial statement regarding the Maine drug distribution activity was consistent with his trial testimony. Fifth, the impeachment evidence is cumulative. At trial, during his cross examination, Mr. Ramirez testified that he had been untruthful with law enforcement on multiple occasions, and that he was testifying with the hope of lenient treatment by the Government. The record, therefore, does not support a finding that an additional instance of untruthfulness would have altered

the jury's determination.  Sixth, Mr. Ramirez's testimony concerning Defendant's involvement in the drug distribution conspiracy was corroborated by several witnesses who participated in the conspiracy or aided the conspirators through drug trafficking activity.  The testimony of Ms. Dowling, Ms. Hakola, Mr. Hunter, Mr. Ingersoll-Meserve, Mr. Lamar, and Ms. Thetonia supported both the conviction and the determination that the drug quantity was 280 grams or more.

In sum, Defendant has failed to establish that Mr. Ramirez's post-trial statements warrant a new trial.

## CONCLUSION

Based on the foregoing analysis, I recommend the Court deny Defendant's Motion for New Trial and for Indicative Ruling.  (ECF No. 719.)

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 22nd day of February, 2018.